## FREDERICK ODELL RAYNOR and AMOS JEHAGEN, Plaintiffs in Error, v. STATE OF TENNESSEE, Defendant in Error.

Court of Criminal Appeals of Tennessee. Sept. 8, 1969.

Certiorari Denied by Supreme Court Nov. 17, 1969.

Hugh W. Stanton, Jr., Memphis, for plaintiffs in error.

George F. McCanless, Atty. Gen., Robert H. Roberts, Asst. Atty. Gen., Nashville, William D. Haynes and Joseph L. Patterson, Asst. Dist. Attys. Gen., Memphis, for defendant in error.

OPINION

WALKER, Judge.

The defendants below, Raynor and Jehagen, were tried jointly with one Herman Walls for robbery with a deadly weapon. Walls was acquitted, but these defendants were found guilty. Raynor was sentenced to fifteen years and Jehagen to twenty-five years in the penitentiary. They have appealed their convictions to this court.

The State's proof shows that at about 2:30 P.M. on July 2, 1967, Raynor, Jehagen and a third person entered Kelley's Quality Market in Memphis and robbed the manager, George Davidson, of approximately $900. Jehagen held a pistol on Davidson and forced him to open the safe. Davidson observed Jehagen carefully and was able to describe him and his clothing in detail. Davidson also described Raynor's clothing, but he did not see Raynor's face well. Mrs. Carrie Gaines, a cashier, identified both defendants as being two of the participants in the robbery. Floyd Hall, Jr., age fifteen, identified Raynor as one of the three who entered the market and ran out carrying a sack.

The three robbers ran to a white Mustang automobile and fled. Davidson described one as wearing a wine colored shirt, brown and black shoes, and he gave that person's race, complexion and approximate size and weight. He also described the black with white "V" collar shirt and blue jeans worn by the second robber.

E. L. Treadway, of the Memphis Police Department, heard the description and within a few minutes after the

robbery he saw two men like those described. They were in a blue-green Pontiac automobile and in the vicinity of the robbery. He and his partner followed in their squad car and he turned on its dome light. Walls drove into a service station to buy some gas and got out. The officers told the other two to get out. The officers saw, without making a search, a paper sack open on the car's back floorboard with money visible to them. They arrested the defendants and recovered $758, some of which was identified as that taken from the market.

Jehagen did not testify. Raynor denied being in the market or taking any part in the robbery. He said that he, Jehagen and one Carruthers were walking and caught a ride with a person he did not know in a car he could not describe; they got out and Carruthers left; they then received another ride with Walls, with whom he did know. He denied any knowledge of the money which was in the sack at his feet.

■ The defendants assign as error the admission of their in-court identifications by Davidson and Mrs. Gaines. At a hearing out of the presence of the jury, the trial judge found that the defendants were not represented by counsel at their lineups. He excluded testimony of the lineup identifications but held that the lineup procedure did not taint the in-court identifications. The trial judge properly held that the in-court identifications had an independent source and were not tainted by improper lineups.

■■ Jehagen contends that the instructions to the jury on the presumption from the possession of recently stolen property amounted to a directed verdict of guilt

and conflicts with the presumption of innocence. The unexplained exclusive possession of stolen property shortly after the commission of a robbery may warrant a finding that the possessor has guilty knowledge of the larceny or robbery. See Tackett v. State, 443 S.W.2d 450, opinion by our Supreme Court released for publication June 27, 1969. Recent unexplained possession of stolen property gives rise to the inference that the possessor has stolen it. White v. State, 210 Tenn. 78, 356 S.W.2d 411; Peek v. State, 213 Tenn. 323, 375 S.W.2d 863. This does not force the defendant to testify.

This is a rule from which the jury had the right to infer guilt of robbery or larceny and does not infringe on the defendant's privilege to remain silent. See State v. Young, 217 So.2d 567 (Supreme Court of Florida).

■ The defendants say that the money found in the car was the result of an illegal arrest and search. A felony had been committed, and the two defendants closely fit the description given the officers of two of the robbers. Both Walls and Raynor testified that they entered the service station to buy gasoline. Without making a search, the officers could see the open paper sack filled with money. They were warranted in making the arrests on probable cause. T.C.A. Sec. 40-803(3); West v. State, 221 Tenn. 178, 425 S.W.2d 602. One who is lawfully arrested may be searched in his person or premises, including his automobile, without a warrant, provided the search is incident to the arrest. White v. State, supra.

■ Furthermore, constitutional rights are not violated when a law officer, without any trespass against a

defendant, and while he is at a place where he has a right to be, looks and sees evidence which is plainly visible. See Sneed v. State, 221 Tenn. 6, 423 S.W.2d 857. No search is involved in the discovery of evidence, when it is in plain and open view in a public place.

The defendants demanded pretrial statements of Davidson and Mrs. Gaines. The trial judge did not err in refusing to allow defendants' counsel to examine them. Hunter v. State, Tenn., 440 S.W.2d 1.

The defendant Raynor contends that the court was without jurisdiction to try him because at the time of the offense he was seventeen years of age. He says that he was a juvenile at the time of the offense and was not taken before juvenile court.

Raynor testified at the trial on April 23, 1968, that he was eighteen years of age. There was no other proof of his age. This did not necessarily mean that he was not eighteen years old at the time of the crime on July 2, 1967.

In response to the invitation of the trial judge to ask questions during the rebuttal examination of Patrolman Treadway, a juror asked the ages of the defendants at the time of the crime. The trial judge inquired and no specific age was given for Raynor and all parties appeared satisfied. No objection or offer of proof was made by defense counsel and the jurisdiction of the court was not challenged during the trial.

[7] Although the question by the juror was proper in this case, the efforts of jurors to ask questions of witnesses during a trial often present delicate problems and should

not be encouraged. They always make it difficult or embarrassing to an attorney to object. Irretrievable and harmful error may result from them.

■ To his motion for a new trial, the defendant attached a photographic copy of what purports to be his birth certificate showing November 18, 1949, as his date of birth. This paper says, "This is NOT a certified copy of the original * * *." No proof was taken at the motion for a new trial. This paper is only a pleading and there is no proof of his age before us.

■ Moreover, a hearing in juvenile court is not required to give criminal court jurisdiction for the offenses described in T.C.A. Sec. 37-265. This includes robbery with a deadly weapon. See State ex rel. Donehue v. Russell, 221 Tenn. 609, 429 S.W.2d 818; Howland v. State, 151 Tenn. 47, 268 S.W. 115; Greene v. State, 210 Tenn. 276, 358 S.W.2d 306.

In State ex rel. Donehue v. Russell, supra, the petitioner challenged his first degree murder conviction because he was not afforded a hearing before the juvenile judge in accordance with the statutes. Considering T.C.A. Sec. 37-231, from which T.C.A. 37-265 is derived, our Supreme Court said:

"(2) Under this Section, the Juvenile Court had no jurisdiction which could have been waived. It was mandatory for the Juvenile Court to remand such juvenile to the Criminal Court.

"A preliminary hearing by the Juvenile Court was not required as a means of conferring jurisdiction upon the Criminal Court. Howland v. State, 151 Tenn. 47, 268 S.W. 115 (1924)."

All assignments are overruled and the judgment of the lower court is affirmed.

This case was heard and submitted to the Court prior to the enactment of Chapter 330 of the Public Acts of 1969 increasing the membership of the Court.

OLIVER, J., concurs.

GALBREATH, Judge (dissenting).

I must respectfully dissent from the conclusion reached by my brethren.

It is strongly suggested from the record before us that the defendant Raynor was seventeen (17) years of age when the offense was committed on the 2nd day of July, 1967. A photostatic copy of the certificate of birth filed without objection as an exhibit to his motion for a new trial sets out Raynor's birthdate as the 11th day of November, 1949, which establishes his age at some four months younger than eighteen at the time of the crime. True, the photostatic copy of the certificate of live birth attached as a supporting document or exhibit to the motion for a new trial might not meet the strict legalistic requirements of proof in the face of an objection, but in this case there was no move on the part of the State to exclude the exhibit on such grounds as the best evidence or hearsay rule. It is obvious from the copy of the birth certificate that it is exactly what it purports to be and it is well known to this writer and should be a matter of judicial knowledge it is felt that such documents are, in the absence of question as to their authentication at the time they are offered, universally accepted by governmental agencies as proof of age. There seems to be no doubt on the part of anyone concerned that as a mat-

ter of fact the defendant Raynor was indeed the person concerning the birth of whom the certificate was issued. Although the facts themselves set out in the motion for a new trial as to the defendant's age would only be a pleading as pointed out in the majority opinion, the accompanying exhibit of the birth certificate, when not objected to, was strong evidence to support the pleading and in this case was unrebutted. Assuming, as I am forced to do, that the defendant Raynor was indeed a juvenile at the time of the crime and there being no suggestion in the record that jurisdiction of the juvenile defendant was ever vested in the trial court, its judgment as to this defendant in my opinion should be set aside and the cause remanded for procedure under our statutes that provide when a person less than eighteen years of age is under investigation for certain serious felonies, including rape, murder and robbery with a deadly weapon, jurisdiction is vested in the Juvenile Court to determine if there is probable cause to believe the child has committed such an offense. (T.C.A. § 37-265)

How the defendant Raynor's case came to the Criminal Court in view of his age does not appear. There is no suggestion that the defendant himself misled anyone as to his correct age. Why neither the arresting officers, the attorney general's office, the clerk's office, the attorney appointed to represent the indigent by the court, nor the trial judge himself ever inquired into this basic, fundamental matter is a source of some puzzlement to the writer. Evidently, there was some question in the minds of the jury as to the maturity of the defendant because one of them asked the court what the ages of the defendants were at the time of the crime. The court under-

took some investigation when asked for this information by the jury by inquiring of the arresting officer and the attorneys but after doing so announced:

"Gentlemen, this officer doesn't know that information. Alright, anything further?"

The defendant was before the court and had elected to testify and had done so. It would seem the judge should have asked him the simple question needed to clear up the doubt. The defendant testified that his present age was eighteen. This was on the 22nd day of April, 1968, almost ten months after the crime was committed the year before. This should have suggested the strong likelihood that the defendant was a juvenile at the time of the crime.

This precise question has not, so far as my research reveals, been decided in Tennessee. There is a strong intimation in a habeas corpus case seeking to avoid a conviction resulting from a juvenile lying to his court-appointed attorney, the district attorney and the trial court by telling them he was eighteen when, in fact, he was seventeen, that if the record before the trial court had contained any indication of his true age his later collateral attack upon the judgment would have been sustained. In that case, Bomar v. State ex rel. Stewart, 201 Tenn. 480, 300 S.W.2d 885, the court based its reversal of the lower court's finding that the conviction was void for lack of jurisdiction on the fact that the relief sought was only available on a direct appeal, such as this, and said:

"A clear statement of the rule is found in the New

York case of People ex rel. Hubert v. Kaiser, 206 N.Y. 46, 99 N.E. 195, 197, to-wit:

" '* * * when jurisdiction depends on the existence of a certain fact, and the court has found the fact, the fact stands until reversed upon direct' appeal.

"The New York case of People ex rel. Davis v. Jennings, 133 Misc. 538, 232 N.Y.S. 603, 605, though the decision of a nisi prius court, is referred to because it makes the same question as to the relator's age when convicted in a previous case of some criminal offense. The writ was denied with this observation:

" 'Where the jurisdiction depends upon certain facts, and the court has passed upon those facts, its determination is conclusive until reversed or set aside', citing several N.Y. cases.

"In the present case the jurisdiction of the criminal court over Stewart depended, in so far as pertinent here, upon a certain fact, to-wit, his age. The Trial Court made inquiry as to that fact, and found that Stewart was eighteen years old. This finding was based upon Stewart's own statement to his Court appointed attorney and to the district attorney. Such being the situation, the Court's finding in the matter is conclusive on collateral attack, according to the weight of authority."

Surely, if a defendant is entitled, as the above cited case intimates, to habeas corpus relief, he should be entitled to it on direct appeal.

I strongly disagree with the majority's implication that a proceeding under T.C.A. § 37-265 may be dispensed with in cases wherein a juvenile commits the serious

felonies, including robbery with a deadly weapon, set out therein. It is clear to me that recent Federal decisions such as *Kent* and *Gault* have overruled Howland v. State, 151 Tenn. 47, 268 S.W. 115 (1924) and, indeed, Bomar v. Stewart, *supra,* strongly supports this conclusion. The main authority relied on by the majority, State ex rel. Donehue v. Russell. 221 Tenn. 609, 429 S.W.2d 818, has no application at all to the facts here for the simple reason that in that case, as contrasted to this one, the Juvenile Court of Hamilton Court *did* make a finding of probable cause as directed by the statute and *did* transfer Donehue to Criminal Court. Donehue's complaint was that he was not present at the time such a finding was made by the Juvenile Court, whose order recited:

> " 'In this matter, evidence having been presented to me concerning the charge of murder against the said Willie Arthur Donahue and I have considered the facts, find that Willie Arthur Donahue is guilty of murder in the first degree or murder in the second degree.

> " 'I, therefore, conclude that the Juvenile Court does not have jurisdiction to finally dispose of said matter.

> " 'It is, therefore, ordered that the matter be dismissed in the Juvenile Court and the same is hereby remanded to the Sheriff of Hamilton County, Tennessee, to proceed as if the said Willie Arthur Donahue was an adult defendant.

> " 'This 21st day of June, 1963.
> Burrell W. Barker
> Judge of the Juvenile Court.' "

Although I do not contend here, as it is not necessary, that a juvenile defendant has a right to be present before the Juvenile Court making such a vital determination effecting his liberty (although In re Whittington, 391 U.S. 341, 88 S.Ct. 1507, 20 L.Ed.2d 625, indicates that at such a hearing a juvenile may be constitutionally entitled to counsel) the statute seems to leave no doubt that such a finding must be made by the Juvenile Court, just as it was made in *Donehue*. Whether it is made in presence or in the absence of the juvenile is not the point here as it was in *Donehue*. The sole determinative point seems to me to be that such a finding must be made before the Criminal Court acquires jurisdiction. Such a determination by a Juvenile Judge, in my opinion, should be as indispensable in the case of a child as an indictment or presentment is in the case of an adult.

As aforesaid, the juvenile defendant herein did nothing to mislead the court. It would be well for all concerned in the prosecution of youthful defendants to take adequate precautions to satisfy themselves that the jurisdictional age has been reached in the absence of compliance with the Juvenile Court Act because as held in a number of recent Federal cases, from the moment a child commits an offense he is exempt from the criminal law unless and until the Juvenile Court waives its jurisdiction. See Harling v. United States, 111 U.S.App.D.C. 174, 295 F.2d 161; Pee v. United States, 107 U.S.App. D.C. 47, 274 F.2d 556. In these cases, the courts held, as did we recently in Willie Clark v. State, released 11-21-68 (cert. den.) that statements obtained from juveniles while in police custody prior to statutory juvenile proceedings are not admissible on subsequent criminal

trials following transfer of jurisdiction from the Juvenile to criminal tribunals.

Although it is true that in most instances the hearing before a Juvenile Court Judge following the alleged commission of a capital crime by a minor is rather perfunctory and is merely a vehicle to give jurisdiction to the Circuit or Criminal Court, it is conceivable that in some cases the all important question of probable cause in the case of an accused child might be determined differently by a judge devoted and committed to protection of the welfare of those of tender years than might a grand jury whose members are seldom called upon to consider the incapacities of minority. It was obviously to shield children from the relatively stricter degree of accountability which attorney generals and grand juries expect of adults in deciding whether probable cause to indict and prosecute exists that motivated the legislature to confer the initial responsibility in this regard on a court created especially to consider the disability of childhood. I do not think this responsibility can be circumvented. The same set of circumstances that might convince a grand jury that a twenty-five year old probably committed a crime might not convince a judge skilled in the waywardness sometimes encountered in the adolescent that a seventeen year old probably did so.

I would reverse the conviction of the defendant Raynor for the reason set out above as well as the following which relate also to the defendant Jehagen whose conviction in my opinion should also be nullified.

For the purpose of discussing the reasons further

prompting reversal, it will be necessary to relate certain of the facts as outlined in the record.

On the 2nd day of July, 1967, four young Negro men robbed the Kelley Grocery Store in Memphis. It was following a police broadcast of the description of the bandits that these defendants, together with a third young man who was acquitted, were arrested. It is contended that the arresting officers lacked probable cause to make the arrest and that evidence found in the automobile occupied by them at the time should not have been admitted into evidence because it was obtained by means of an unlawful arrest and is excludable under the holdings of such cases as Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Thus, it should be necessary to determine whether, under the circumstances as outlined in the record, the arrest was justified.

The clerk who furnished the description to the police of the men who robbed his store testified that he saw the face of only one of the bandits, later identified as Jehagen. His description of Jehagen was, in substance, to the effect that he was a Negro, approximately 20-23 years of age; wearing either a red or wine colored shirt; black shoes with a brown border; about six feet tall; about 160-165 pounds in weight; also wearing a watch and tinted glasses. He could not say as to the color of his pants, although it later developed upon arrest that Jehagen was wearing trousers of a rather unusual color, golden.

As to the only other one of the four men about whom any detail other than race, sex and apparent youth was

noticed, the clerk testified that one of them was wearing a dark or black slipover type shirt and pants of a levi, bluejean or denim type, and was approximately 5' 8" in height and weighed about 155 pounds.

The most important fact known about the bandits, it is suggested from the record, is that they fled the scene in a 1967 white Ford Mustang automobile, a very distinctive appearing vehicle that should not to a trained observer be mistaken for any other make. As aforesaid, there was no specific description of either of the other two men who accompanied Jehagen and Raynor.

It follows that the police were, or should have been, on the alert for *four* young Negro men in a *white 1967 Mustang*. For some reason the number of the men being sought was not agreed upon by the clerk who furnished the information and one of the arresting officers who testified of the broadcast concerning the robbery which conveyed to him and his partner the information on which they sought to justify the arrests, "It told there was a white Mustang with *three* male, coloreds. That one male, colored had on a wine colored shirt, was tall and slender. That one male, colored had on a dark shirt, dark pants, possibly bluejeans. We didn't have any clothing description on the third one." This officer also related in other portions of his testimony that he had been advised that the suspect with the colored shirt had on brown and black shoes and was wearing "tinted sun shades." Also, that the ages of the men ranged from about 18 to 20.

Armed with the limited and in some respects, misleading information set out above, the officers stationed

themselves at the busy intersection of Bellevue and Brooks about 3:00 P.M. on the Sunday afternoon thinking, as one of them expressed it, that they might see a white Mustang come by. Whether they saw a white Mustang or not does not appear in the record but shortly after placing the intersection under surveillance they did see a *blue-green Pontiac Firebird automobile* going east on Brooks toward Bellevue. There were, in the words of the witness, "three male, coloreds in it, and we observed a male colored on the passenger side of the front seat with a wine colored shirt. We saw a male colored on the back seat with a black shirt * * *." The one in the back seat leaned back, according to the officer, in a suspicious manner and a decision was made to apprehend the occupants of the Pontiac. According to the arresting officer, the following occurred:

> "We pulled out onto Brooks and pulled in behind the Firebird and the light turned green about the time we got in behind the Pontiac, at which time we cut our red light on and he pulled * * *, made * * *, turned back north on Bellevue and turned into the service station lot there * * *. We got out. We told them to get out that we wanted to talk to them and they got out."

It was following this that one of the officers looked into the Pontiac and discovered a sack on the rear floorboard containing money alleged to have been stolen in the robbery.

The description of the apprehending given by the driver of the Pontiac, who was exonerated by acquittal after testifying that he knew nothing of the robbery

and had picked the two defendants here up as hitch-hikers a few minutes before, was not disputed. This witness said:

> "When they pulled up, they told us to get out of the car. All three of us got out of the car and they told us to stand still, and don't you know, not to try anything. And then the officer with the glasses on, he walked over to the car and looked in it. Then he was talking to the other fellow, he was asking us our names and he came back to the car and he opened the door and he bent over in the car and opened the sack and there was some money in it."

The only significant variance in the testimony of the above quoted witness and the officers is that the sack was open so that the money could be seen without it being opened by the officer. Both of them could be correct as the sack could have been partly opened when first seen and later completely opened by the officer.

The determinative issue is whether the officers had a lawful authority to stop the blue-green Pontiac and arrest its occupants at a time when they were looking for a white Mustang on the strength of the color of one of the occupants' shirt and what was interpreted as a suspicious move by another. It should be borne in mind that many of the significant items in the sketchy descriptions of the two men noticed by the store clerk were of no aid at all to the police in arriving at the decision to apprehend the occupants of the car. They could not tell, for example, that one of them had on brown and black shoes; the men being seated in a moving vehicle it could not have been ascertained with any de-

gree of accuracy that either of them were between 5′ 8″ and 6′ in height or that their weights were in the vicinity of 155-165 pounds, although it should be noted that the heights and weights involved are perhaps close to those of the average adult. It could not appear from the vantage point of the officers that one of the men was wearing bluejeans.

All the officers had to go on was that three male, colored men were in a blue-green Pontiac, one wearing a wine colored shirt and one a black shirt at a time when they were looking for a number of young colored males in a white Mustang, one wearing a wine colored shirt, and one a black shirt. And this in a predominately Negro section of a huge city containing within its metropolitan area hundreds of thousands of Negroes, many of whom would have fit the description given by the clerk of the store located several blocks away.

The trial judge seriously considered the objections raised as to the introduction of the evidence concerning the bag of money found by the police in the Pontiac and concluded, "The officers had this right after they saw that bag to make the arrest which they did."

This would be a fair statement of the law if the arrest resulted from a valid search. However, as I view the facts here, the arrest preceded the search and thus the legality of the search hinges in turn on the legality of the arrest.

First, were the occupants arrested at the time the officers found the bag? I think so. Before submitting to police authority they were in an automobile, the innocent driver of which was operating it in a lawful manner along a public street. The progress of the automobile was in-

terrupted by the well known police signal of a flashing light, and the driver forced against his will to pull into a service area. Then the occupants were ordered to get out of the car and did so in direct response to the dictates of the police.

> "An arrest, as the term is used in criminal law, signifies the apprehension or detention of the person of another in order that he might be forthcoming to answer for an alleged or supposed crime." 5 Am.Jur. 2d, Arrest § 3.

An arrest, simply speaking, is the interference with another person's right of locomotion, and may be accomplished in countless ways, some involving, but not limited to, threats, physical restraint, oral communication or visual gesture, such as the brandishing of a revolver in a manner that signifies one should raise their hands and not move. When such an arrest is illegal it sometimes results in civil actions for false imprisonment and the courts of Tennessee have gone to some lengths in describing the elements necessary to constitute such an interference with personal liberty. In one such case involving the stopping of persons proceeding along a public street as in this case our Court of Appeals said:

> "Where one stops another on the public road and by means of threats, or otherwise stops him, and in consequence of such conduct, the plaintiff is stopped and not permitted to pass along, as he had a right to do, this constituted an illegal imprisonment." Travis v. Bacherig, 7 Tenn.App. 645.

As an arrest is in criminal law simply the act of capturing or apprehending one suspected of crime, it neces-

sarily follows that before there can be an illegal imprisonment there must be an arrest, or interference with the right of another to move.

We were recently presented with a somewhat similar factual situation forcing reversal of a case in which the officers were on the lookout for an undescribed automobile containing three white men suspected of a crime in Hartsville believed to be fleeing along the connecting road to Gallatin. Armed with this slight information, the officers stopped an automobile containing three men and a subsequent search uncovered evidence of criminal activity resulting in conviction. I feel that Judge W. Wayne Oliver's concurring opinion in that case would be even more applicable to this case in which the officers, instead of being on the lookout for an unknown make of car containing three men headed in a specified direction, were on the lookout for a car completely different from the one stopped and going in a direction they had no way of anticipating and containing a different number of men than those who had committed the crime under investigation. Judge Oliver said:

"The presiding fact, alone determinative, is that the defendants' arrest was illegal. The arresting officer had no semblance of reasonable grounds or probable cause therefor. He selected one automobile at random upon the highway, only because it contained three men. An arrest by an officer without a warrant must be based upon probable cause when it is predicated upon commission of a felony. T.C.A. § 40-803; Jones v. State, 161 Tenn. 370, 33 S.W.2d 59; Fox v. State, 214 Tenn. 694, 383 S.W.2d 25; Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142. When an

officer arrests upon information, it must be such as would justify a reasonable man in believing that the particular person arrested was guilty of a felony. Jones v. State, *supra*.

"If there is no probable cause for the arrest, a search of the person or his property is not permissible. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134; Beck v. Ohio, supra; McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62. And evidence derived from an unlawful arrest is the fruit of official illegality and cannot be used against the person unlawfully arrested. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441." Lawson et al. v. State, Opinion of Court of Criminal Appeals, released 3-5-69.

If the officers in this case had been armed with a warrant for the search and seizure of four young Negro men in a 1967 white Ford Mustang, would any court uphold the search and seizure, under the authority of such a warrant, of three young Negro men in a blue-green Pontiac automobile? The officers may not do without a warrant that which the Constitution of the United States prohibits with a warrant. To allow such circumvention would have the effect of nullifying the protections afforded by the Constitution by the simple device of never making application for a warrant at all.

One of the most recent of the many decisions of the United States Supreme Court reiterating this principle condemning the use of "fruits" obtained in violation of the Fourth Amendment said:

"Nothing seen or found * * * may legally form the

basis for an arrest or search warrant or for testimony at the * * * trial, since the prosecution would be using the fruits of a Fourth Amendment violation. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)." Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

I cannot agree with the majority's theory that the search was legal because it was preceded by a legal arrest which was itself preceded by a lawful visual inspection of the automobile. From the moment the officer ordered the defendants out of the car and they complied (and this was the first order of business) the illegal arrest was consummated.

For the reasons set out herein, I would reverse the convictions and remand for new trials.