**STATE of Tennessee, Appellee,**

v.

**Bobby Lee JEFFRIES, Appellant.**

Court of Criminal Appeals of Tennessee,
at Jackson.

Oct. 28, 1982.

William M. Leech, Jr., Atty. Gen., Ann Lacy Johns, Asst. Atty. Gen., Nashville, Edgar A. Peterson, IV, Asst. Dist. Atty. Gen., Memphis, for appellee.

A.J. Archibald (at trial), April R.W. Ferguson (on appeal), Memphis, for appellant.

## OPINION

WALKER, Presiding Judge.

On the first phase of this trial July 7–13, 1981, the jury found the appellant, Bobby Lee Jeffries, guilty of selling a controlled substance, heroin, and fixed his punishment at 12 years in the penitentiary. On the second phase of the trial, the jury found him guilty of being an habitual criminal. In accordance with its verdict, the trial court sentenced Jeffries to life imprisonment.

This is the third trial of the case. On direct appeal we reversed the first conviction and remanded it for a new trial, *Bobby Lee Jeffries v. State,* 640 S.W.2d 854 (Tenn. Cr.App., 1979). The second trial, held December 1–9, 1980, resulted in a mistrial when the jury was unable to agree on a verdict.

The state's evidence on this trial showed that on February 12, 1977, Memphis police officers Martin and Willis were working undercover in narcotics investigations. Steve Howell, a drug addict, was an informant for them. Sergeant R.J. Sanders supervised the undercover drug operation of the officers. At about 9:00 p.m., February 12, 1977, Howell went into the Marcus Jazzland Record Store where the appellant worked. He then came out of the store with the appellant. Officer Martin testified that he, the informant and the appellant got into an automobile parked at the record shop, and that he purchased from the appellant four quarter teaspoons of heroin for $100. Although he did not know the appellant personally, he had seen Jeffries' photograph and recognized him. He described the appellant and his clothing and identified him in the courtroom.

Officer Willis sat in a nearby car. He had also seen a photograph of the appellant

and identified him. Willis testified that he saw the transaction. Howell was not available to testify, but a transcript of his testimony at the second trial was read in the state's rebuttal proof. By that testimony he brought the appellant to the officers and the appellant sold the heroin to Officer Martin. A laboratory test showed that the purchased material was heroin.

The appellant relied on an alibi. He was not arrested until 13 months after the incident but he and his witnesses testified that February 12, Lincoln's birthday, was also the birthday of Jeffries' grandmother, Mrs. Mary Lee Jeffries. For that reason the date was fixed in their minds. He and his witnesses also testified that he never wore clothing like that described by the officers.

In his testimony Jeffries denied selling any drugs to the officers and said that on that day he did not work or go to the area of the record shop. He spent the night with his girl friend Gloria at the home of his uncle and aunt. He denied any drug dealing. His uncle and aunt corroborated his alibi.

The birth date of Mary Lee Jeffries was controverted. She had died since the second trial, but her testimony from that trial was read to the jury. According to it she was born February 12, 1903, and had used that date for her social security records. She said that a birth date of February 4, 1904, on her voter registration card was incorrect. An official from Social Security in Memphis testified that their records showed the February 12, 1903, date. Clara Sykes, daughter of Mrs. Jeffries, testified that she had grown up believing February 12 was her mother's birthday. The state introduced into evidence a copy of the registration card showing the February 4, 1904, birthdate and a copy of Mrs. Jeffries' death certificate showing her date of birth as February 20, 1904.

We first consider whether or not the trial judge exceeded the bounds of his discretion by encouraging or permitting the jurors to ask questions of the witnesses.

Although it does not appear that the trial judge initially invited the jurors to ask questions, he allowed extensive questioning covering 42 pages of the transcript. Most of this was directed to the defense witnesses, particularly those supporting the alibi.

The state thoroughly cross-examined Wilma Ingram, who testified that in 1977 she and her now-deceased husband had owned the shopping area where the appellant worked; that Jeffries did not work February 12, 1977, and she did not see him that day. She also testified that the area was dimly lit.

The court then permitted a lengthy examination of Ms. Ingram by the jurors covering approximately 14 pages of the transcript. They propounded about 50 questions to the witness. Among them:

"JUROR: My question, the reason for my line of questioning is that if the gentleman was working for you in February, then shortly thereafter he was, whatever took place, whether he was taken in custody or whatever did take place, if that man was an employee of yours and he was in such a position to be a manager, why wouldn't you have known or why wouldn't you have said something back at that time if he were such an important employee of yours and so forth and it wasn't until September of '78 that all this took place?"

. . . .

"JUROR: I was just wondering, I'm sorry, but if I had somebody working for me and they had some offense committed ----"

After the jurors' extensive and close examination of Mrs. Ingram, the appellant's counsel, out of the presence of the jury, moved for a mistrial. In denying the motion the trial court expressed the hope that the jurors' questions would not progress to the point that it had just before. He mentioned that at one time he had seen three jurors' hands up at the same time seeking to question the witness. Defense counsel suggested that the jurors submit questions in writing to the court.

When the jury returned, the trial judge told them that he would permit their questions but would cut off their discussions. He also remarked that, depending on the number of questions, he might change the procedure to require written questions. With this invitation the jurors continued to question witnesses as is reflected in 20 more pages of their interrogation in the transcript.

Many of the jurors' questions were prejudicial; they were argumentative; some of them were outside of the issues and showed that the juror had become prejudiced against the appellant.

In *Raynor v. State,* 1 Tenn.Cr.App. 556, 447 S.W.2d 391 (1969), this court pointed out: "(T)he efforts of jurors to ask questions of witnesses during a trial often present delicate problems and should not be encouraged. They always make it difficult or embarrassing to an attorney to object. Irretrievable and harmful error may result from them." In *Branch v. State,* 4 Tenn.Cr. App. 164, 469 S.W.2d 533 (1969), we said that permitting jurors to ask questions is a perilous practice and should be avoided.

In *Byrge v. State,* 575 S.W.2d 292 (Tenn. Cr.App.1978), a juror, without warning or prior approval of the trial court, asked one question of an expert witness. In *Byrge* we held that each case must be judged on its facts in determining whether error had been committed. We found none there.

The Oklahoma Court of Criminal Appeals considered extensive juror questioning in *Krause v. State,* 75 Okl.Cr. 381, 132 P.2d 179 (1942). It said:

"We think it proper that a juror may ask an occasional question where something has been said by a witness that is confusing to a juror for the purpose of clarifying the matter. The extent to which the trial court may allow such questioning by the juror is a matter in the discretion of the court.

The difficulty in allowing a juror to question a witness arises by reason of the fact that the juror is not an attorney, most of them are not familiar with the rules of evidence, and they might inten-

tionally or inadvertently ask some question which is wholly improper and one which should not be answered; yet, if counsel for the defendant objects or defendant fails to make answer to the question the juror, or jurors, might think the witness was concealing something from them and little credence would therefore be placed in the testimony of the witness. For that reason, trial courts should be very careful in allowing jurors to ask questions from a witness and where the question asked by a juror appears to be improper, the trial court should interrupt without requiring counsel for defendant to object and state that such question is improper and direct the witness not to make response thereto."

See generally Annot., 31 A.L.R.3d 872 (1970), Jurors—Questioning Witnesses; *State v. Martinez,* 7 Utah 2d 387, 326 P.2d 102 (1958).

 The trial court abused its discretion by permitting the extensive examination by the jury of the witnesses here. Jurors appeared to take the role of advocates for the state in their examination of witnesses. This action of the jurors was prejudicial to the appellant. The judgment must therefore be reversed.

Although this case must be reversed, we have examined all of the other issues presented by the appellant and find them to be without merit.

The appellant was granted a number of continuances, and he was responsible for most of the delay in the retrial of the case. The record shows no motion for a speedy trial, and he has showed no prejudice. Likewise, he showed no systematic exclusion of blacks from the jury nor an unconstitutionally selective prosecution. The record shows no prejudice on the part of the trial judge because he had heard the earlier trials of the appellant.

Contrary to Jeffries' contention, the imposition of a life sentence for a nonviolent felony under habitual criminal proceedings is not cruel and unusual punishment. *Metheny v. State,* 589 S.W.2d 943 (Tenn.Cr.

App.1979); *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).

After this trial the appellant filed a pro se motion seeking a transcript of his second trial which resulted in a mistrial. The trial judge properly overruled the motion. Jeffries complains that he could not "counter the use of the tape recording of Steve Howell's testimony." He and his attorney had a complete transcript of Howell's testimony at the second trial in the transcript adduced at the third trial. Jeffries was in no way denied access to this transcript. Further, he made no objection at the trial.

The evidence was sufficient to support the conviction and the trial judge properly denied the claim of newly discovered evidence.

*Reversed and remanded for a new trial.*

DUNCAN and BYERS, JJ., concur.