# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### MAY 1999 SESSION

FILED

August 19, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | C.C.A. NO. 02C01-9805-CR-00142 |
| Appellee, | ) | |
| | ) | SHELBY COUNTY |
| VS. | ) | |
| | ) | HON. ARTHUR T. BENNETT, |
| DERRICK SAYLES, | ) | JUDGE |
| | ) | |
| Appellant. | ) | (Second Degree Murder) |

**FOR THE APPELLANT:**                    **FOR THE APPELLEE:**

**JEFFREY S. GLATSTEIN**                   **MICHAEL E. MOORE**
200 Jefferson, Suite 1313                  Solicitor General
Memphis, TN  38103
      (On Appeal)                          **PETER M. COUGHLAN**
                                           Asst. Attorney General
**EDWIN C. LENOW**                          John Sevier Bldg.
100 North Main Bldg.                       425 Fifth Ave., North
 Memphis, TN  38103                         Nashville, TN  37243-0493
      (At Trial)
                                           **WILLIAM L. GIBBONS**
                                           District Attorney General

                                           **JAMES A. WAX, JR.**
                                                -and-
                                           **PATIENCE R. BRANHAM**
                                           Asst. District Attorneys General
                                           201 Poplar Ave., Ste. 301
                                           Memphis, TN  38103-1947

**OPINION FILED:**_____

**REVERSED AND REMANDED**

**JOE G. RILEY,**
**JUDGE**

# O P I N I O N

A jury found the defendant guilty of the second degree murder of Marvin Randolph. The defendant now appeals, raising the following issues for our review:

I. whether the evidence is sufficient to support the defendant's conviction;

II. whether the trial court abused its discretion by refusing to allow defense counsel to cross-examine a state witness regarding possible promises made in exchange for his testimony;

III. whether the trial court abused its discretion in allowing extensive juror questioning of a state witness;

IV. whether the state committed plain error by asking the defendant on cross-examination whether he had ever "borrowed" someone's car without permission; and

V. whether cumulative error requires a new trial.

Finding error in the refusal to allow defense counsel to develop impeachment proof of the state's key witness, we **REVERSE** and **REMAND** for a new trial.

## FACTS

At trial, Antonio Callicutt testified that on the afternoon of October 16, 1996, while he was sitting on the front porch of his residence, he saw the victim, Martin Randolph, in his car at a stop sign on the corner of his street. According to Callicutt, he saw the defendant, also known as "Baba," ride a bicycle to the victim's car, yell "Payback, mother f - - - - -," and shoot him repeatedly. Callicutt testified that the defendant was accompanied by other individuals, that "[t]hey were shooting the gun," and that when the victim's car began to drive away, "[t]hey kept shooting" and then left the scene in a Suburban driven by Corey Ragland. When asked to clarify who "they" were and who shot at the victim, Callicutt explained that while the defendant was accompanied by "some more boys," the defendant was the only one shooting. Callicutt testified that after the shooting, he followed the victim's car to a local Piggly Wiggly grocery store, where it crashed into a parked car. Callicutt admitted he was

currently in jail awaiting an indictment on an aggravated robbery charge, but he denied being promised anything in exchange for his testimony.

On cross-examination, Callicutt denied being with Rhonda Nichols, a family friend, on the day of the shooting. He admitted he had a prior conviction for solicitation to commit a felony. The defense attorney asked him several questions regarding his prior inconsistent testimony at a preliminary hearing. The defense attorney based his phrasing of Callicutt's prior testimony on his own handwritten notes from the audio tape of the preliminary hearing. Callicutt flatly denied making almost all of the statements attributed to him by defense counsel.

The dairy manager at the local Piggly Wiggly store testified that he was eating his lunch in his car in the parking lot when the victim's car smashed into his car. The dairy manager testified he asked the victim who shot him, and the victim replied, "Baba did it." The victim later bled to death from a gunshot to his leg that severed an artery. An investigating officer testified that after the incident, the defendant admitted his nickname was "Baba."

After the state rested, Rhonda Nichols, a close friend of Callicutt's family, testified that on the day of the shooting, Callicutt was not at his house, but rather was watching television with her and members of his family at his aunt's nearby house. She testified that when they heard the shots, they went outside to see what happened, but the street was empty of people and cars.

The security guard at Piggly Wiggly testified that after the victim crashed into the parking lot, he asked him who shot him, and the victim replied, "Ray-Ray." He testified the victim might have said "Baba," but he heard "Ray-Ray."

The defendant testified on his behalf, denying that he shot the victim, who he claimed not to have known. According to the defendant, he spent the afternoon in

3

question at home and at the Boy's Club. He admitted that one of his nicknames was "Baba."

**SUFFICIENCY OF THE EVIDENCE**

The defendant complains that the evidence is insufficient to support his conviction. As support for his argument, the defendant complains that Callicutt's testimony is internally inconsistent, in that he first testified "they" shot the victim, but then later testified that only the defendant shot the victim. As the state concedes, the record reveals that Callicutt was a rather inarticulate witness, which explains why he was often prompted by the district attorney, the defense attorney, and even the jury to explain his answers.

The defendant also asserts that the record shows Callicutt's trial testimony was inconsistent with his prior testimony at a preliminary hearing. The record reveals that the defense attorney asked Callicutt several times about the substance of his preliminary hearing testimony. Defense counsel did not have a written transcript of the preliminary hearing testimony, so he relied upon the notes he took while listening to the preliminary hearing audio tape to phrase what he represented Callicutt's prior testimony was. For example, the defense attorney asked,

> Okay. And let me ask you please, sir, if you were asked these questions and did you give these answers:
>
> > "Question: Who was driving your car? Corey was..." -- and you gave this answer. "Corey was in my car on the next street."

Each time the defense attorney questioned Callicutt in this way, however, Callicutt denied having testified the way the defense attorney represented he had. Questions by counsel are not evidence.

The defendant also notes that Callicutt's testimony is directly contradicted by Ms. Nichol's testimony that Callicutt was with her at the time of the shooting and did

4

not witness anything. Because the jury, not this Court, decides questions concerning witnesses' credibility, the weight and value given to evidence, and all factual issues, the defendant's sufficiency challenge will not succeed merely because a state witness's testimony conflicts with a defense witness's testimony. *See* State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

The gist of the defendant's argument is that his conviction rests entirely upon the testimony of Callicutt whose testimony is both incredible and contradicted. The record does not support the defendant's claim that Callicutt's testimony is the only evidence against him. To the contrary, the record shows that shortly after the victim was shot, he told the Piggly Wiggly dairy manager that "Baba" shot him. There is ample evidence, including the defendant's own admission at trial, that the defendant is "Baba." Granted, the evidence presented by the defendant squarely contradicted much of the state's evidence. It is the jury's duty, however, to sort through those contradictions and assign credibility, and here, the jury opted to accredit the state's witnesses. Because a review of the evidence in the light most favorable to the state reveals that a rational trier of fact could have found beyond a reasonable doubt the essential elements of second degree murder, the defendant's sufficiency challenge must fail. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

## ATTACK ON CALLICUTT'S CREDIBILITY

The defendant next challenges the trial court's decision not to allow him to cross-examine the prosecutor and/or Callicutt about whether promises were made in exchange for Callicutt's testimony against the defendant. The record shows that, after jury selection but before the state presented any evidence, the bailiff reported to the trial judge that Callicutt was refusing to enter the courtroom because he was scared. With the jury absent from the courtroom, the trial judge ordered Callicutt to enter the courtroom, and he eventually complied. Callicutt testified under oath that

5

earlier that morning, the defendant threatened him and told him not to testify. Callicutt also testified that two individuals visited his girlfriend and child at his house and threatened that "something" would happen if Callicutt testified.

Callicutt insisted he did not want to "be involved" or testify in this case. The trial court asked Callicutt if he would still be scared to testify if the court reduced his bond in order to limit his exposure to the defendant in jail. Callicutt replied that he would still be exposed to the defendant if he was indicted and the defendant was convicted. He continued to adamantly insist that out of his and his family's best interests, he did not want to be involved in this case, even if that meant he would be charged with perjury.

Following a recess, a bench conference was held during which the parties discussed Callicutt's testimony. The defense attorney related that the defendant denied threatening or even being near Callicutt. One of the prosecuting attorneys reported that she needed to talk to Callicutt to ask him for a phone number where his girlfriend could be reached. The trial judge called another recess, suggesting that the prosecuting attorney might send an investigator with a subpoena to talk to Callicutt's girlfriend.

After the second recess, the state proceeded with its first witness, the victim's mother, whose testimony was relatively short. Immediately following her testimony, Callicutt was called to testify before the jury, where he proceeded to testify against the defendant without a hint of hesitation or reluctance. The record does not explain Callicutt's change of heart regarding his testimony. Callicutt testified before the jury that he was not promised anything in exchange for his testimony.

Following Callicutt's testimony, the jury exited the courtroom for a recess. However, prior to Callicutt leaving the courtroom and prior to any recess by the court, one of the prosecuting attorneys addressed the trial court. He stated, "we feel that

[Callicutt] testified truthfully and in light of the fact that there have been some threats allegedly made . . . and I have reviewed the case against him, the state would recommend a $1,000 bail for [Callicutt]." The prosecuting attorney stated that "[Callicutt's] file just appeared on my desk," having been given to him by an assistant, "not knowing at any time the involvement that Mr. Callicutt had with this case." The prosecuting attorney stated he believed Callicutt's case would be submitted to the grand jury as simple robbery, not aggravated robbery. Although noting Callicutt had a prior felony conviction and numerous misdemeanors, he stated Callicutt testified truthfully and recommended a $1,000 bond.

The trial judge accepted the state's recommendation, reducing Callicutt's bond accordingly, and stated it was doing so because of the threats lodged against him and his family so that "at least, we can keep this defendant and this witness separated as long as possible." The following then transpired:

[DEFENSE ATTORNEY]: Will that be told to the jury?

THE COURT: No. They don't need to know that.

[DEFENSE ATTORNEY]: Because they had said that there was nothing -- that he has nothing and now they're making --

[PROSECUTING ATTORNEY]: He was not promised anything. I stated as an officer of the court he was not promised anything for that.

THE COURT: No. He wasn't promised anything. I'm doing this based on threats. In fact, I may recommend grand jury proceedings that may go against your client. I've got it under advisement. So I'm doing this based on threats to him. He's testified under oath as well as there's allegations that his family members have been threatened to keep him from testifying. All right. That's the end of that. It doesn't go before the jury.

[DEFENSE ATTORNEY]: Could we make a tender of proof so that will be in this trial record.

THE COURT: Proof of what?

[DEFENSE ATTORNEY]: To have [the prosecuting attorney] testify that he's made a recommendation so the proof -- in case the case goes up that --

THE COURT: What do you mean?

7

[DEFENSE ATTORNEY]: The jury has been told that initially he had no deals and now they're coming in after he's testified and recommending a $1,000 bond.

[PROSECUTING ATTORNEY]: He had no deal. I mean, I don't know how to say that any clearer.

THE COURT: He's already testified now.

[DEFENSE ATTORNEY]: Yes, sir.

THE COURT: And the court is doing this based on threats to him, too. I'm taking that into consideration more than anything else. In fact, that's about the only thing about reducing the bond to that amount. It may should be [sic] reduced some anyway if it's not going to proceed on aggravated robbery. But the reason I'm considering a $1,000.00 [bond] is because of these threats and his demeanor, scared to come in the court. We had to force him in the court because of these threats. And he finally came in. So that's the court's action. All right.

An accused has the right to explore on cross-examination any promises of leniency to the prosecution witness in order to show motive for testifying falsely for the state. State v. Smith, 893 S.W.2d 908, 924 (Tenn. 1994); State v. Norris, 684 S.W.2d 650, 654 (Tenn. Crim. App. 1984). Undue restriction of this right may violate a defendant's right to confrontation. Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). Evidence of any understanding or agreement relating to the future prosecution of a state witness is certainly relevant to credibility, and the jury is entitled to know of it. Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Specifically, the refusal to allow defense counsel an opportunity to cross-examine a prosecution witness about an agreement with the state as to future prosecution violates the Confrontation Clause of the Sixth Amendment. Delaware v. Van Arsdall, 475 U.S. at 679.

In the case at bar defense counsel on cross-examination of Callicutt did not ask him about his change of heart or a possible agreement with the state. Nor did he ask the trial court to be allowed to recall Callicutt after the bond recommendation was made. This may have been a tactical decision as it might have led to testimony concerning alleged threats by the defendant. However, this does not end our inquiry.

8

When Callicutt was first called into the courtroom, he adamantly and continually insisted that he would not testify, even if it led to another criminal charge against him. The trial court mentioned the possibility of a reduced bond. One of the prosecuting attorneys stated she needed to talk to Callicutt concerning the alleged threat to his girlfriend. Then, when called to testify before the jury, Callicutt obviously had a change of heart and testified without any hesitation whatever. Immediately after Callicutt's testimony, the state recommended the reduced $1,000 bond.

The defendant was clearly entitled to explore what, if anything, the prosecuting attorney told Callicutt prior to his testifying, and whether there had been an agreement between the state and Callicutt. Specifically, the defendant was entitled to determine if the prosecuting attorney told Callicutt anything that would make Callicutt think he would be released on bail or receive any other favorable treatment if he testified for the state. *See* Giglio v. United States, 405 U.S. at 154-55.

Defense counsel properly proposed to make an offer of proof by questioning one of the prosecuting attorneys. *See* Tenn. R. Evid. 103(a)(2). The prosecuting attorney argued there was no agreement, and defense counsel was not allowed to pursue an offer of proof. We do not know what would have developed if defense counsel had been allowed to pursue his offer of proof. However, the mere statement by the prosecuting attorney that there was no agreement is insufficient to deny defendant the right to pursue evidence relating to the credibility of the state's key witness. Under these circumstances, the only possible remedy is a remand for a new trial.

**JURY QUESTIONING OF CALLICUTT**

Next, the defendant challenges the trial court's decision to allow the jury to pose questions to Callicutt. A trial court has broad discretion in controlling the

9

conduct of a trial.  State v. Gibson, 973 S.W.2d 231, 245 (Tenn. Crim. App. 1997).

A key consideration for whether the trial court abused its discretion in allowing jury

questioning of a witness is whether it was prejudicial to the defendant.  State v.

Jeffries, 644 S.W.2d 432, 435 (Tenn. Crim. App. 1982).  Thus, a trial court abused

its discretion by allowing forty-two transcript pages of argumentative, prejudicial,

irrelevant, and biased questioning by several jurors who assumed the role of state's

advocate.  *Id.* at 434-35.


Here, the record reveals that near the end of the defense counsel's cross-

examination of Callicutt, one juror spontaneously asked Callicutt a question.  The trial

judge replied, "Don't ask any questions.  If you have a question, just pose it to us."

The defense counsel's questioning of Callicutt resumed, and a few moments later,

both the defense counsel and the prosecutor announced they had no more questions

for this witness.  While the jury passed around some picture exhibits, the parties held

a bench conference on an unrelated matter.  The bailiff then informed the trial court

that one of the jurors had a question.  The trial court required the juror to pose the

question to the court, and before the witness answered the question, the judge

approved it.


In all, the jurors posed six questions to Callicutt.  Prior to the witness

answering the questions, the trial court screened the questions, giving his approval

that the question was acceptable.  Five of the six juror questions were rephrased by

either the assistant district attorney or the trial court, but one was not.  Of the six

questions, one was previously asked and answered, another served to clarify the

witness's testimony, and the remainder appeared to solicit new evidence; however,

all of the questions were germane to the issues raised during the witness's testimony.

After three of the six questions, the defense attorney asked extensive follow-up

questions, even taking the opportunity at one point to try to impeach the witness with

his prior statement to police.

10

We conclude the jury questioning was not prejudicial to the defendant. In fact, given the substance of some of the witness's answers and the additional opportunity to impeach the witness, much of the questioning benefited the defendant. As such, we find no abuse of discretion. This issue is without merit.

## PREJUDICIAL QUESTION BY THE STATE

Finally, the defendant claims that a question posed by the state constituted plain error. While cross-examining the defendant during trial, the state questioned the defendant about his primary mode of transportation, that is, whether he had a car or whether he relied upon his bike and/or rides from Corey Ragland. The defendant testified that he sometimes drove his parents' car. The state asked whether he had ever driven any other cars, and the defendant replied he had. The state then asked whether he had "borrowed" those other cars without permission. Before the defendant answered, the defense attorney lodged a general objection, which was sustained. The issue was then dropped; the state switched lines of questioning; and the defendant did not request any further remedy, such as a curative instruction or mistrial.

Because the defendant did not raise this issue in his motion for new trial, we will reverse only upon a finding of plain error. *See* T.R.A.P. 3(e); Tenn. R. Crim. P. 52(b); State v. Ogle, 666 S.W.2d 58, 60 (Tenn. 1984). Plain error is error that affects the "substantial rights" of the defendant and needs to be corrected in order "to do substantial justice." Tenn. R. Crim. P. 52(b). This burden is not met under the circumstances of this case. This issue is without merit.

## CONCLUSION

Based upon our examination of the record, we conclude the defendant was improperly denied the right to develop evidence relating to the credibility of the state's key witness. The judgment of the trial court is, therefore, REVERSED and the case REMANDED for a new trial.

_____
**JOE G. RILEY, JUDGE**


**CONCUR:**


(See separate dissenting opinion)
**JOHN H. PEAY, JUDGE**


_____
**THOMAS T. WOODALL, JUDGE**