FILED
08/31/2017
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### February 7, 2017 Session

## STATE OF TENNESSEE v. SHANTHONY TYWON MAYS

**Appeal from the Circuit Court for Obion County**
**No. CC-14-CR-112       Donald E. Parish, Judge**

_____

### No. W2016-01390-CCA-R3-CD
_____

Defendant, Shanthony Tywon Mays, was convicted by an Obion County Jury of one count of aggravated robbery, three counts of aggravated assault, and one count of unlawful possession of a weapon. The trial court imposed a sentence of twelve years for aggravated robbery, four years for each count of aggravated assault, and four years for unlawful possession of a weapon, to be served concurrently with each other and consecutively to the sentence in an unrelated case. On appeal, Defendant raises the following issues: (1) whether the trial court properly overruled Defendant's objection to the jury venire; (2) whether the trial court properly instructed the jury concerning possession of recently stolen property; (3) whether the evidence was sufficient to support Defendant's convictions; and (4) whether the trial court erred in denying Defendant's motion for new trial based on newly discovered evidence. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

James T. Powell, Union City, Tennessee, for the appellant, Shanthony Tywon Mays.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Russell Johnson, District Attorney General; and Jim Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Background*

**State's Proof**

On the night of May 15, 2014, Sharmen Twining and Samantha Milligan were working at the 3J's Food Mart in Union City. Ms. Twining was working as a cashier, and Ms. Milligan was the shift manager. At approximately 11:30 p.m., two men dressed in black walked into the store and ordered everyone to get on the floor. Tina Webb and her daughter were also in the store at the time. One of the men had a gun that Ms. Twining and Ms. Milligan both described as black. Tina Webb specifically testified that the man pointed the gun at her when he told her to get on the ground. Ms. Twining testified that she could not see the men's faces, and she passed out after she got down on the floor. Ms. Milligan testified that she was in the kitchen washing dishes when she heard people "hollering." She leaned out and saw a man who pointed a gun at her and told her to step out of the kitchen. The other man pushed Ms. Webb's daughter down and used her as a "prop" to jump over the counter, and he rummaged through some items before the two men fled. Ms. Milligan called police after the men left. Ms. Twining testified that Ms. Milligan woke her up, and she saw coins on the floor and noticed that the cash bag was missing. She said that the bag read, "City State Bank" and contained $1,050.00.

Don Walker testified that he was parked outside the 3J's Food Mart at approximately 11:30 p.m. on May 15, 2014. He worked as a patient tech for Durable Medical Equipment in Murray, Kentucky and had stopped at the store to purchase some food. While he was sitting his van, Mr. Walker noticed two young men walking up the sidewalk to his left side. He said that they "huddled up" before proceeding quickly to the door. He said, "that's kinda what caught my attention was them running up the sidewalk [ ] toward the door." Mr. Walker testified that one man was wearing a dark-colored hoodie and the other was wearing a light-colored (white) hoodie. He further testified:

> And I noticed one gentleman in the white hoodie had pulled a gun out and the guy with the darker hoodie had jumped the counter and got the money bag. They come right back out the door in maybe 20, 30 seconds from the time I saw them initially until they were going back down the sidewalk in the same direction that they came from.

Officer James Key of the Union City Police Department testified that he was dispatched to the robbery at the 3J's Food Mart on May 15, 2014. He had received a dispatch with a description of the suspects that described them as two black males dressed in black and wearing bandanas over their faces. Officer Key turned in at the north entrance of the Union City Elementary School. He shined his spotlight around looking for the suspects. Officer Key testified:

When I got around to the back of the elementary school, I was shining all the little cubby-holes and nooks and crannies that were blacked out, and got around to the back where the loading dock area is for the cafeteria, and there's approximately a four-foot retainer wall. I come around the retainer wall, shining back into the corner there by the loading dock. When I shined to that back corner, two males popped up.

He noted that it was approximately 11:34 when he saw the two men. The area where the two men were found was approximately 300 yards from the 3J's Food Mart. Officer Key exited his patrol car and told the two men to walk toward the patrol car with their hands up. He noticed one of the men, identified by Officer Key as Defendant, had a black bandana still tied around his neck. Officer Key testified that he knew Defendant but he did not know the other man who was later identified as Jimal Williams. The two men were taken into custody and placed in separate patrol cars.

Officer Key and other officers began looking for clothing that may have been discarded. Around a nearby air conditioning unit located between twenty to forty yards from where Defendant and Mr. Williams were found, officers found a red money bag, a white cotton glove, loose currency amounting to $841, and a black zip-up hooded jacket. Near another air conditioning unit, officers found brown cargo pants, blue sweatpants, and three additional white gloves. The officers continued searching the area and found a black t-shirt and a blue hoodie near a "hedgerow" and a parking lot. It began raining so the evidence was placed in brown bags and labeled. The items were transported to the police station where the clothing was taken out and hung to dry in the evidence room. Once the items dried they were placed in the evidence locker.

Officer Key transported Defendant to the sheriff's office. During the drive, Defendant asked questions about what was happening, and he made statements. Officer Key told Defendant to stop talking, and he advised Defendant of his *Miranda* rights. Defendant said that his clothing did not "fit" the description of the clothing that the robbery suspects were wearing. Officer Key noted that he never told Defendant anything about the clothing. Defendant also asked Officer Key how he could be charged with robbery if he did not have a gun.

On cross-examination, Officer Key agreed that Defendant could have heard "radio traffic" about the robbery while Defendant was sitting in the patrol car. Officer Key testified that Defendant was wearing black and white camouflage pants when he was found, which did not match the description from the robbery.

Investigator Susan Andrews of the Union City Police Department took photographs at the 3J's Food Mart, and she interviewed Ms. Twinning and Ms. Milligan. Investigator Andrews viewed the store's surveillance video of the robbery. She

- 3 -

attempted to get copies of the video but the copies would not play, and she eventually used her camera to make a video of the video. Investigator Andrews drove to the Union City Elementary School after she left the store and took possession of the evidence collected around the area of the school. Investigator Andrews was later advised by the Tennessee Bureau of Investigation (TBI) Crime Lab to send the white gloves along with specimens from Defendant and Mr. Williams for comparison testing.

Special Agent Kristen Meyers of the TBI Crime Lab, Serology Unit, testified as an expert in the field of DNA analysis. She conducted a DNA analysis of the white gloves and compared them with saliva samples from Defendant and Mr. Williams. Special Agent Meyers confirmed that two of the gloves contained DNA that was consistent with that of Mr. Williams. She was able to obtain a partial DNA profile from another glove. She could exclude Mr. Williams from the sample but she was unable to exclude Defendant. Special Agent Meyers was also able to obtain a partial DNA profile from another glove. The profile was consistent with Defendant's DNA but the probability of selecting an unrelated person to be included as a contributor was approximately 1 in 8 for the African-American population, 1 in 27 for the Caucasian population, and 1 in 44 for the Southwestern Hispanic population. The comparison was inconclusive with respect to Mr. Williams.

Sergeant Brandon Adams of the Union City Police Department testified that he and other officers drove back to the scene of the robbery at approximately 5:30 to 6:00 a.m. on May 16, 2014, to search for a weapon. He found a silver, chrome-plated gun lying in a ditch and near a hedgerow at the Union City Elementary School. Sergeant Adams testified that the gun was lying in the "riprap" in the ditch. He noted that the gun had rust on it, and the only thing linking the weapon to the robbery was the area in which it was found near the 3J's Food Mart.

Corporal Charles Moran testified that he transported Mr. Williams to the jail, and Officer Key transported Defendant. Corporal Moran stayed at the jail with Defendant and Mr. Williams to complete paperwork. He took the clothing that each man was wearing and placed them in bags and then transported the clothing to the police department. Investigator Susan Andrews was again called to testify. She said that she received the bags of clothing that Corporal Moran took from Defendant and Mr. Williams at the jail. Defendant's bag contained in part a pair of purple Nike Air tennis shoes. The State showed the surveillance video of the robbery to the jurors and urged them to compare some of the clothing found on and around Defendant and Mr. Williams to the clothing worn by the robbers during the robbery. The prosecutor specifically told the jurors:

> Ladies and gentlemen, I'll direct your attention to the individual on the
> right side and ask you to compare what you see in that photograph to

what's being presented here and draw your attention to the shoes. As you can see, I'm going to ask you to look at the laces on the shoes.

Investigator Andrews testified that Mr. Williams' bag contained a pair of white Nike Air tennis shoes. The prosecutor also asked the jurors to compare those shoes with the ones seen in the surveillance video being worn by the robbery suspect who was standing on top of the counter. Investigator Andrews noted that one of the shoelaces of the gunman's shoes was white, and the other was darker.

Jimal Williams testified that he participated in the robbery of the 3J's Food Mart on May 15, 2014. He said that the robbery was Defendant's idea, and they had talked about the robbery for a "few days" before it occurred. Mr. Williams testified that he and Defendant met at "East Gate" before the robbery, and he thought Defendant brought a shirt and gloves with him. He said that he and Defendant were dropped off at the store. Mr. Williams did not know who dropped them off.

Mr. Williams testified that he "jumped the counter" during the robbery and took the money while Defendant held the gun. He and Defendant ran behind the school after the robbery and hid behind a wall. Mr. Williams testified that they stopped running in order for Mr. Williams to change clothing. He thought that Defendant also changed clothes. They left the clothes behind the school and left the money near a "vent." Mr. Williams testified that at the time of Defendant's trial, he had already been sentenced for aggravated robbery and three counts of aggravated assault. In exchange for his trial testimony, the State recommended that he receive the minimum sentence for aggravated robbery with the sentence to run concurrently to the sentence in another case.

**Defendant's Proof**

Defendant testified that he did not rob the 3J's Food Mart on May 15, 2014, nor was he present in the store at the time of the robbery. He said that he decided to walk to the store that night to purchase some A&D ointment for a tattoo that Curtis Jackson was going to finish putting on his neck and also to get something to eat. Defendant testified that he was supposed to be at Mr. Jackson's house at 10:30 p.m. to finish the tattoo. He said:

> As I was walking to the store there on Bishop Street, I decided to cut behind Golden Living Nursing Home, come up behind the school, cross a little ditch, and about the time I was approaching behind the school, I noticed there was a car behind the school. When I was walking, I [saw] two individuals standing by the car. And as I was walking, I seen a flashlight come on me, and I seen it was an officer with his gun drawn on me, told me to freeze, don't move. So I did what the officer told me to do. He walked up to me and placed me in handcuffs. I asked what

was going on. He said that I fit a description of a second robbery suspect, and I was placed under arrest. And that's how I came - - that's how I seen Mr. Williams. And that was it that night of my day.

Defendant identified his pants that were taken from him after he arrived at the jail, and he also identified his shirt and pull-over. He said that none of the articles of clothing found by the officers near the scene belonged to him, and he had never seen them before. Defendant testified that he told Officer Key that he did not match the description of the robbery suspects because Defendant had heard the description announced over the police radio while he was sitting in the patrol car. He also heard information dispatched over the radio about a weapon. Defendant testified that he told Officer Key to compare his shoes with the video of the robbery and that his "shoes would prove [his] innocence." Defendant also testified that he did not have any mud on his person at the time of his arrest even though some of the clothing recovered near the scene had mud on them. Defendant claimed he was not sweating or breathing hard when he was arrested, indicating that he had not been running.

Defendant testified that he knew Mr. Williams because the two had an altercation a couple of years prior over a "female." He said that it had been a "while" since he had seen Mr. Williams prior to May 15, 2014. Defendant said that Mr. Williams' trial testimony was not truthful. He also testified that the gloves and shoes shown during trial did not belong to him even though Corporal Moran testified that he took the shoes from Defendant at the jail. Defendant testified that he was wearing blue "Vans" at the time of his arrest, and Corporal Moran listed the shoes on his report as being blue. He noted that the shoes were a size 9, and Defendant wore a size 10. Defendant did not know what happened to his shoes after they were taken by Corporal Moran. Defendant denied ever seeing the gun that was recovered by officers near the scene.

On cross-examination, Defendant testified that he was not behind the retainer wall when the officer first saw him. He also felt that either Corporal Moran or Investigator Andrews switched his shoes.

**State's Rebuttal Proof**

Corporal Moran testified that he placed Defendant's clothing in a paper bag and transported it to the police department and gave it to Investigator Andrews. He was the only person at the jail with access to the bag of clothing. Corporal Moran testified that he did not switch any shoes with another pair.

Investigator Susan Andrews also testified on rebuttal. She received the package of clothing from Corporal Moran and placed it in the evidence locker along with money found near the scene. Investigator Andrews testified that the bag was sealed and never opened until sometime later for the prosecutor to look at. She then re-bagged the items

because the bags were damaged when they were opened. Investigator Andrews took photographs of the contents of Defendant's bag which depicted the purple shoes introduced at trial. She denied tampering with the shoes in the bag. Investigator Andrews noted that the property receipt prepared by Corporal Moran listed the shoes as being blue.

Officer James Key reiterated that he saw Defendant and Mr. Williams behind the retainer wall on May 15, 2014. He was certain that Defendant did not walk up to him while he (Officer Key) was searching the area.

*Analysis*

**Jury Pool**

Defendant argues that the trial court erred by overruling his objection to the jury venire because it was not a fair cross section of the community as Defendant is a "member of the black race and there were no members of the black race in the entire jury venire." The State responds that Defendant has failed to establish a prima facie case that "African-Americans were under-represented in the venire or that they were systematically excluded from the jury pool because of their race."

Under the Sixth and Fourteenth Amendments to the Constitution, juries must be drawn from a source that is "fairly representative of the community" in which the defendant is tried. *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S. Ct. 692, 703 (1975). No person has a constitutional right to be tried by a jury of his or her own race, either in whole or in part. *Harvey v. State*, 749 S.W.2d 478, 481 (Tenn. Crim. App. 1987); *see also Wheeler v. State*, 539 S.W.2d 812, 815 (Tenn. Crim. App. 1976). The fact that there were no African-Americans on the jury is not proof, by itself, of a violation of any right. *Harvey*, 749 S.W.2d at 481. To establish an improper jury venire, one must show: "'(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to the systematic exclusion of the group in the jury-selection process.'" *State v. Nelson*, 603 S.W.2d 158, 161 (Tenn. Crim. App. 1980) (quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979)).

Prior to trial in this case, Defendant objected to the jury venire because there were no potential African-American jurors, and therefore, the jury was not a jury of his peers. There had been two African-American members in the initial jury pool, but one was disqualified for having a prior felony conviction and the other had served on the grand jury. Therefore, they were dismissed. The State stipulated that there were no African-American jurors in the jury venire. The Circuit Court Clerk noted that approximately 170 jurors were summoned, and a "large amount of prospective jurors" were not served with

a summons. The clerk did not know the race of each juror that was summoned. The trial court then gave Defendant the option of continuing his trial to another date in order to gather evidence for an evidentiary hearing on the issue at a later date or to have an immediate hearing. Defendant was called to the stand and examined by trial counsel. Defendant indicated that he did not want to continue his trial in order to obtain information on past jury venires to determine the percentage of African-American jurors in those venires to see if they were representative of the percentage of African-Americans in the community. Defendant testified that he wanted to have his trial that day.

Defendant called Obion County Circuit Court Clerk Harry Johnson to testify. Mr. Johnson said:

> It's my responsibility, once the judge signs the order of the number of jurors that we're going to bring in, I instruct my deputy clerk to key in the computer. We use a Department of Safety disc to bring up a number of jurors, whatever number that might be.

Mr. Johnson testified that the driver's license list did not designate a race; however, he did receive "a percentage page on the back of that list that will say that's approximately that amount." He said that the jury list for Defendant's case reflected the following populations for that particular list: "First off was unknown, was 36.08 percent. African-American was 9.49 percent. Asian 1.27 percent. Caucasian 50.63 percent. Hispanic 1.9 percent. And the other is .63." Mr. Johnson agreed that the jury venire did not represent the percentage of African-Americans listed on the back of the jury list.

Mr. Johnson testified that he had several names from the list that came back as not served. He said, "By 'not served,' I mean if they - - the sheriff's department mails out a certified or registered mail to this person's address. If they did not pick it up, they were not served." Mr. Johnson did not know the race of those potential jurors who were not served. He said that the sheriff's office did not go out and physically try to serve those individuals. Mr. Johnson testified that if 20 additional jurors were called then the sheriff's office "would probably do that."

Mr. Johnson testified that he had been the Circuit Court Clerk for approximately fourteen years. When asked if there had ever been a jury pool that was comprised of 10 percent African-Americans, he replied: "Probably not."

Circuit Court Judge Jeff Parham testified that he had served as a Circuit Court Judge for Obion and Weakley Counties since September 2014. He did not know if he was competent to say whether African-Americans and other minority groups were fairly represented in the jury venires for Obion County. Judge Parham testified: "From my personal observation, there are always fewer blacks in the original jury pool." He noted that in the present case, there were two African-Americans in the original jury venire out

of approximately 80 potential jurors from approximately 170 who were drawn. Judge Parham testified that since he had been judge, he would "find it difficult" to believe that each jury venire was 10 percent African-American.

The trial court made the following findings concerning this issue:

> The Court finds that, with respect to the three factors, that it's important to review that the defendant is an African-American. Therefore, he is a member of a distinctive group in Obion County, Tennessee, entitled to protection under our laws in this particular area. The Court also finds that this racial group is not proportionately represented in this pool. That fact is abundantly clear from all the evidence that we've heard here today and the stipulations that have been made. That's the second factor that the Court should analyze.

> The third factor is whether there's been a systematic exclusion of African-Americans from the jury pool, and the evidence is insufficient for the Court to find that that factor has been met.

Additional jurors were added to the jury pool the following day, none of whom were African-American. Defendant again objected to the jury venire. The trial court noted that 35 additional jurors were randomly selected from the "state's Department of Safety registration," and "the sheriff's office was able to locate to have here this morning 14 persons that were on that list." None of the 14 jurors who appeared were African-American.

Circuit Court Clerk Harry Johnson was recalled as a witness. Mr. Johnson testified that he instructed his deputy clerk to "pull those 35 names." He further testified that the names were pulled "from the computer disc that's loaded from the highway driver's license division[.]" Mr. Johnson noted that the list of 35 jurors contained the following population percentages, "unknown 17, which was 48.57 percent. African-American was 3, which is 8.57 percent. Caucasian 14, which was 40 percent. Hispanic was 1, which is 2.86 percent." Mr. Johnson testified that there were no African-American jurors present in the jury venire.

Sheriff Jerry Vastbinder testified that members of his office were able to locate 14 of the 35 potential jurors. None of the 14 located were African-American. Of the three African-Americans that were on the list of 35, Sheriff Vastbinder testified: "One lady had moved to Georgia. There was one male that is actually a convicted felon and in the Department of Corrections in Kentucky. And then the third one, we were just unable to locate them [sic]."

The trial court again found that "there is no proof of a systematic exclusion of African-Americans from the jury panel, and, therefore, the defendant's motion to essentially quash the panel and declare a mistrial is denied."

Defendant also raised this issue in his motion for new trial. At the motion for new trial hearing, Sheriff Vastbinder testified that his office is provided with a list of names pulled from a database of the Department of Safety by the Circuit Court Clerk's Office. Someone in Sheriff Vastbinder's office then checks each individual's driver's license information to see if the potential juror has moved to another state or county. They can also find out if the person has been convicted of a felony. He said, "So the people that are no longer residents of the county or are felons or whatever are excluded." Sheriff Vastbinder estimated that they lose 25 to 30 percent of the list of names after running the license check.

Sheriff Vastbinder testified that his office sends out registered letters to each person left from the list. He said that the jurors from the first list of names were sent registered letters. The jurors from the second list were personally served. Sheriff Vastbinder testified that some of the registered letters come back as "unsigned for." He said:

> Most of the time, the return letters would come after we actually had pulled the jury pool in; because of the way the post office does it, it would be after the fact. A lot of them would show that they, you know, were unable to be located, period, and there was no further action because we've actually pulled the jury pool in at that time.

Sheriff Vastbinder testified that his office is aware of each potential juror's race after his office runs a check on the driver's license. He said, "We do a printout on each person, so we actually have their photograph to match the driver's license number and the name that we receive on the jury pool." He also confirmed that the list from the clerk's office does not list each juror's race. Sheriff Vastbinder testified: "We do a printout on each person, so we actually have their photograph to match the driver's license number and the name that we receive on the jury pool." Sheriff Vastbinder testified that the purpose of running a juror's driver's license is not to determine the juror's race but is to determine whether the person is a resident of Tennessee and Obion County and to see if the person is a convicted felon. He said:

> It's to get better information, to get more efficient service on the people because basically on a regular mail-out, it costs us about $1200 to do a mail-out, and the more people I can identify as being Obion County residents, then the better service I can get because it's fruitless to send out notification to people that are living in Georgia and Florida.

Sheriff Vastbinder testified that he had never purposefully excluded a juror because of his or her race.

Circuit Court Clerk Harry Johnson testified that he did not know the total population of African-Americans in Obion County. He confirmed that his earlier testimony concerning the percentage of African-Americans referred specifically to the composition of the list of names randomly generated for Defendant's case. When asked to confirm his previous testimony that the black population had never been appropriately represented by percentage in the jury pool, Mr. Johnson testified:

> If I recollect, you asked me, after I told you what the percentages was on the back of that page that I was reading off, you asked me had they ever been appropriately represented, and I said probably not, that I didn't recall.

Deputy Circuit Court Clerk Denise Taylor testified that she primarily deals with the Department of Safety database when it comes time to draw a list of names for potential jury service. She said that the Department of Safety database "uses the driver's license from everyone in the county," and it also uses ID's issued by the Department of Safety. Ms. Taylor testified that the database is updated every "six months or so." She said that the Department of Safety sends the information to the "Local Government Corporation" which provides computer services to the Circuit Court Clerk's Office, and they load the information onto their computer system. Ms. Taylor testified that it was her understanding that every other clerk's office who has Local Government Corporation providing their computer services uses the Department of Safety database. Ms. Taylor testified that she does not know the race of each potential juror when she pulls the jury list.

The trial court reaffirmed that "there was no systematic discriminatory process in jury selection that has led to the exclusion of minority populations from consideration as it relates to [Defendant's] case. It appears to the Court that the system utilized here was racially neutral."

In this case Defendant has not established an improper jury venire. As to the first factor, there is no question that as an African-American, Defendant is in a "distinctive" group in the community. *Nelson*, 603 S.W.2d at 161. However, Defendant has not shown that the representation of this group in venires from which juries are selected in Obion County is not fair and reasonable in relation to the number of such persons in the community. *Id.*

Although there were no African-Americans on the venire in this case, Defendant never established the population of African-Americans in Obion County. As set forth in the above testimony, a list of approximately 170 names were initially selected at random

from the Tennessee Department of Safety database to serve as jurors for Defendant's trial, and those individuals were sent certified letters to report for jury duty. Approximately 80 individuals from the list of 170 potential jurors reported on the first day of trial. Additional jurors were needed, and a list of 35 additional names was randomly selected from the Tennessee Department of Safety database. The Obion County Sheriff's Office was able to locate 14 individuals out of the list of 35 and personally serve them with a summons to report for jury duty. The percentage of African-Americans listed on the back of the first list of 170 names for the venire was 9.49 percent, and the percentage listed on the back of the second list of 35 names was 8.57 percent. There were two African-American jurors on the jury venire from the first list of names. One of those jurors was excluded because he had served as the grand jury foreman, and the other was excluded because he had a felony conviction. There were no African-American jurors on the venire from the second list of names. Mr. Johnson was clear in his testimony that the percentage of African-Americans listed on the two jury lists pertained to the percentage of potential jurors from that particular list, not the entire population of Obion County. We agree that the jury venire in Defendant's case was under-representative of the percentage of African-American jurors listed on the back of the two jury venire lists because there were only two potential African-American jurors from the first jury venire list, and there were none from the second jury venire list. However, because Defendant did not establish the percentage of the African-American population in Obion County, he did not provide "sufficient evidence" to consider whether African-Americans were fairly represented on the venire.

In *State v. Anderson*, No. W2012-01039-CCA-R3-CD, 2013 WL 5531703, at *10 (Tenn. Crim. App. Oct. 4, 2013), a panel of this court held that because the defendant did not present evidence of the African-American population of Dyer County, this court would "not speculate as to whether the representation of African-Americans on the jury venire was fair and reasonable in relation to their numbers in the community." In his brief, Defendant asserts that based on the testimony of both Circuit Court Clerk Harry Johnson and Judge Jeff Parham the "African-American race has never been adequately represented in at least the prior fourteen years." However, Defendant misunderstands their testimony. Mr. Johnson was asked whether prior jury venires reflected a percentage of approximately 9.49 (10) percent African-American, the percentage listed on the back of the first jury venire list. Mr. Johnson replied, "probably not." Judge Parham specifically said that he did not know if he was competent to say whether African-Americans and other minority groups were fairly represented in the jury venires for Obion County. Judge Parham testified that since he had been judge, he would "find it difficult" to believe that each jury venire was 10 percent African-American. Again, he was asked about the percentage of African-Americans on the jury venire rather than the entire population of Obion County.

Even if African-Americans were under-represented in the jury venire in Defendant's case, he has not shown that this under-representation is due to the systematic

exclusion of the group in the jury-selection process. *Nelson*, 603 S.W.2d at 161. The names of potential jurors were randomly selected from a database of driver's licenses and ID's issued by the Tennessee Department of Safety. Ms. Taylor, the deputy circuit court clerk responsible for generating the list of jurors from the database, testified that she does not know the race of each potential juror when she pulls the jury list.

In *State v. Mann*, 959 S.W.2d 503 (Tenn. 1997) the Tennessee Supreme Court stated:

> T.J. Jones, the Circuit Court Clerk for Dyer County, outlined to the trial court the method by which his office selects the jury venire in Dyer County. He testified that his office selects the jury venire from a list of licensed drivers in the county. Out of the total county population of 38,000 people, there are 28,000 licensed drivers. Members of Jones' office calculate the number of jurors required for a two[-]year period, which in this case was approximately 3,000. They then divide the number of licensed drivers by the number of jurors needed. The quotient determines the number of names they will skip when they count down the alphabetical list of 28,000 licensed drivers to obtain 3,000 jurors. Mr. Jones further testified that, of the 150 jurors available for the selection of the appellant's jury, twelve or thirteen were African-Americans. Consequently, African-Americans constituted approximately eight percent of the prospective jurors. Finally, Jones testified that approximately seven percent of the population of Dyer County is African-American.
>
> Accordingly, the record reveals no disparity between the size of the cognizable group in the community and its representation in the appellant's jury venire. Nor does the record contain evidence that the use of driver's license rolls has resulted in the systematic exclusion of African-Americans in the jury selection process. Indeed, our supreme court has approved the use of voter registration lists to select potential jurors. *See State v. Caruthers*, 676 S.W.2d 935, 939 (Tenn. 1984), *cert. denied*, 469 U.S. 1197, 105 S. Ct. 981, 83 L.Ed.2d 982 (1985). Although no court in this state has addressed the use of driver's license rolls in selecting jury venires, we can see no material difference between the use of a list of registered voters and the use of a list of registered drivers. The appellant has failed to establish a prima facie case under either the state or federal constitution. Having completely reviewed the record, we do not find any error in the selection of the jury in this case. This issue is without merit.

*Mann*, 959 S.W.2d at 535-36 (Tenn. 1997). Likewise in this case, Defendant has failed to establish a prima facie case of showing that the jury was improperly selected. Defendant is not entitled to relief on this issue.

**Jury Instruction Concerning Possession of Recently Stolen Property**

Defendant contends that the trial court erred by instructing the jury regarding the inferences that could be drawn from the possession of recently stolen property (money). The Defendant argues that the instruction was not warranted because the money "was found several yards from where [Defendant] was found, and there was no proof, such as DNA or fingerprint evidence, that [Defendant] was ever in possession of the property." The State responds that the instruction was warranted because there was "evidence that [Defendant] and Mr. Williams were in joint possession of the money, which they had recently hidden."

Over the Defendant's objection, the trial court instructed the jury in accordance with the Tennessee Pattern Jury Instructions as follows:

> If you find beyond a reasonable doubt from the evidence that the property in question had been recently stolen and that soon thereafter the same property was discovered in the possession of the defendant, this possession, unless satisfactorily explained, is ordinarily a circumstance from which you may reasonably draw an inference that the defendant gained possession through theft.

> Furthermore, if you find beyond a reasonable doubt from the evidence that the defendant gained possession of the property in question through theft, and you also find beyond a reasonable doubt that the theft could only have been accomplished through robbery you may also reasonably draw an inference that the defendant committed such offense, if this inference is substantiated by facts and circumstances which corroborate that the defendant actually committed the robbery and was not merely a possessor of stolen property. This corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt. As corroboration, you may consider the attributes of possession—time, place, and manner, that the defendant had an opportunity to commit the crime charged, the defendant's conduct, the defendant's false or contradictory statements, if any, other statements the defendant may have made with reference to the property, a false account of how the defendant acquired possession of the stolen property, and any other evidence which tends to connect the defendant with the crime charged.

However, you are never required to make these inferences. It is for you to determine whether the facts and circumstances shown by the evidence in this case warrant any inference which the law permits you to draw from the possession of recently stolen property.

When the evidence is offered that the defendant was in possession of recently stolen property, the defendant has a right to introduce evidence that he came into possession of the property lawfully, or possession may be satisfactorily explained through other circumstances or other evidence, independent of any testimony or evidence offered by the defendant.

The term "recently" is a relative term and has no fixed meaning. Whether property may be considered as recently stolen depends upon the nature of the property and all the facts and circumstances shown by the evidence in the case. The longer the period of time since the theft, the more doubtful becomes the inference which may be drawn from unexplained possession.

The correctness of the inference and the weight to be given any explanation that may be shown by the evidence are matters that must be determined by you, and you are not bound to accept either. You must weigh all the evidence presented as to the defendant's alleged possession of the property in question and decide in the light of all the facts and circumstances present whether any inference is warranted. You are reminded that the burden of proving the defendant's guilt beyond a reasonable doubt remains on the State.

*See* 7 T.P.I - Crim. 42.19 and 42.20 (12th Ed).

A defendant is entitled to "a correct and complete charge of the law governing the issues raised by the evidence presented at trial." *State v. Brooks*, 277 S.W.3d 407, 412 (Tenn. Crim. App. 2008) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995)). In determining whether a jury instruction correctly, fully, and fairly sets forth the applicable law, we review the instruction in its entirety. *Id.* (citing *State v. Guy*, 165 S.W.3d 651, 659 (Tenn. Crim. App. 2004)). "Phrases may not be examined in isolation." *Id*. (citing *State v. Dellinger*, 79 S.W.3d 458, 502 (Tenn. 2002)). On appellate review, an erroneous jury instruction will result in a reversal only where it "so infected the entire trial that the resulting conviction violates due process." *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008) (quoting *Cupp v. Naughten*, 414 U.S. 141, 94 S. Ct. 396, 38 L.Ed.2d 368 (1973)) (internal quotation marks omitted).

Our supreme court has upheld jury instructions stating that possession of recently stolen property, unless satisfactorily explained, creates a permissible inference that the possessor committed the theft. *State v. James*, 315 S.W.3d 440, 450-51 (Tenn. 2010). Our supreme court noted that such "[i]nferences from recently stolen property have a long history and widespread acceptance." *Id.* at 448 n. 5. Additionally, our supreme court has held that a jury may "infer a burglary from possession of recently stolen property only when there exists a rational connection between possession and participation, when guilt more likely than not flows from possession, and, importantly, when there is some other evidence corroborating the burglary that warrants the inference." *Id.* at 452. In doing so, our supreme court cited with approval a selection from the California Pattern Instructions "which can apply equally to theft, burglary, or robbery." *Id.* at 454 n. 13. Likewise, this court has previously held that a robbery could be inferred from possession of recently stolen property. *Raynor v. State*, 1 Tenn. Crim. App. 556, 447 S.W.2d 391, 393 (Tenn. Crim. App. 1969).

Here, the evidence at trial established that the Defendant and Mr. Williams were found hiding behind a retainer wall located approximately 300 yards from the 3J's Food Mart where the robbery occurred. Defendant and Mr. Williams also matched the description of the two men who robbed the store, and Defendant was still wearing a black bandana tied around his neck. In and around a nearby air conditioning unit, located between 20 to 40 yards from where Defendant and Mr. Williams were found hiding, were a red money bag, loose currency, discarded clothing, and gloves. The trial court instructed the jury that it was not required to make the inference and emphasized that the burden was on the State to prove the Defendant's guilt beyond a reasonable doubt. *See James*, 315 S.W.3d at 454. Accordingly, we conclude that the trial court did not err in instructing the jury regarding the inferences that could be drawn from the possession of recently stolen property.

### Sufficiency of the Evidence

Defendant contends that the evidence at trial was insufficient to support his convictions for aggravated robbery, three counts of aggravated assault, and one count of unlawful possession of a weapon. Specifically, Defendant asserts that the State failed to establish Defendant's identity as the perpetrator. The State responds that the evidence was sufficient to sustain Defendant's convictions.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See*

*Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Defendant does not contend that the State failed to prove the elements of any offense for which he was convicted other than his identity as the perpetrator of the offenses. The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). The perpetrator's identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010). The question of identity is a question of fact left to the trier of fact to resolve. *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982).

In this case, Mr. Williams testified that he and Defendant participated in the robbery of the 3J's Food Mart on May 15, 2014, and that the robbery was Defendant's idea. He said that they talked about the robbery for a "few days" before it occurred. Mr. Williams thought that Defendant brought a shirt and gloves with him. He said he "jumped the counter" during the robbery and took the money bag while Defendant held the gun. Mr. Williams admitted that he and Defendant ran behind the school after the robbery, discarded incriminating clothing, and stuffed the money into the vent of an air-conditioning unit. They hid behind a wall afterwards.

Mr. Williams' testimony was corroborated by the evidence presented at trial. Sharmen Twining and Samantha Milligan both testified that two men dressed in black clothing robbed the 3J's Food Mart and that one of the men had a black gun. Tina Webb

also testified that one of the men had a gun that he pointed at her, and the other man used her daughter as a "prop" to jump over the counter. The man rummaged through several items, and the two men fled with the money bag from the store containing, according to Ms. Twining, $1,050.00. Minutes after the robbery, Officer Key found Defendant and Mr. Williams together behind the Union City Elementary School hiding behind a retainer wall located approximately 300 yards from the 3J's Food Mart. The two men were near clothing consistent with that seen in the surveillance video of the robbery. Defendant was still wearing a black bandana around his neck. The money bag and currency from the robbery were hidden in the ductwork of an air conditioning unit located 20 to 40 yards from where Defendant and Mr. Williams were hiding. Also, the shoes that Defendant was wearing when he was arrested were consistent with the shoes worn by the gunman during the robbery, as depicted in the surveillance video. Although Defendant claimed that the shoes introduced at trial were not the ones that he was wearing, the jury was free to disbelieve his testimony. Mr. Williams' DNA was found on two of the gloves recovered from the area where he and Defendant were found, and one of the gloves contained DNA that was consistent with Defendant's DNA. Although the DNA was not conclusively established, the jury was free to determine that it was Defendant's DNA. A silver, chrome-plated gun with rust was also found the following morning lying in a ditch near the 3J's Food Mart and the Union City Elementary School. The surveillance video shows that one of the men had a gun during the robbery.

The jury, as was its prerogative, obviously accredited the testimony of the State's witnesses including Mr. Williams. Therefore, we conclude that the evidence is sufficient to support Defendant's convictions for aggravated robbery, three counts of aggravated assault, and one count of unlawful possession of a weapon.

### Newly Discovered Evidence

Defendant argues that the trial court should have granted him a new trial based upon newly discovered evidence because Mr. Williams "sent two letters, one to [Defendant] and one to [Defendant's] sister, in which he recanted his testimony at trial."

The decision as to whether to grant a motion for new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court. *State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997) (citing *Hawkins v. State*, 417 S.W.2d 774, 778 (Tenn. 1967)). When seeking a new trial based on newly discovered evidence, a defendant must show that neither he or she nor counsel had knowledge of the evidence prior to trial and that he or she and counsel exercised reasonable diligence in attempting to discover it during the trial, that the evidence is material, and that the evidence would likely change the result of the trial. *State v. Nichols*, 877 S.W.2d 722, 737 (Tenn. 1994); *State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). The test for granting a new trial in cases involving recanted testimony as newly discovered evidence is based on the following criteria:

A new trial may be granted because of recanted testimony when (1) the trial judge is reasonably well-satisfied that the testimony given by a material witness was false and that the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, was surprised by false testimony, or was unable to know of the falsity until after the trial; and (3) the jury might have reached a different conclusion had the truth been told. *State v. Mixon*, 983 S.W.2d 661, 666 (Tenn. 1999)).

*State v. Housler*, 193 S.W.3d 476, 494 (Tenn. 2006).

In this case, at the sentencing hearing, Defendant presented two letters that he claimed were written or directed to be written by Mr. Williams. In one letter, which Mr. Williams admitted to writing and which was sent to Defendant, he said that he hoped Defendant would beat the charges, and he wished that he could "take that sh[it] back." Mr. Williams testified that he sent the letter after he testified against Defendant at trial. The second letter was sent to "Jaqeesha Smith," Defendant's sister. Mr. Williams testified that the second letter was written by an inmate in the Weakley County Jail at Mr. Williams' direction. The second letter contained the following:

> I'm sorry for [lying] on Shanthony. I should've never done it but they made me do it, they told me if I was to tell the truth and say he was never there and that he was walking up that they was [going to] take my 8 years back and give me 12 and a [perjury] charge. I was scared[.] I didn't have a choice[.] That's why I made sure to tell his lawyer when he was asking me questions that they offered me a deal to lie on him[,] and I did it because I wanted less time. But if he was to have another [trial] I will come to say that I lied from the start[.] I wanted to tell you that I'm sorry and tell Shanthony I was sorry and I will make it better if he get[s] a retrial.

Mr. Williams testified that he directed the second letter to be written in order to help Defendant. He said that the second letter was a "lie" and that he asked someone else to write it because it was not the truth. Mr. Williams testified that the second letter was written because he had received a letter from someone else asking him to write the second letter. The letter directing him to write the second letter was still under his mattress in his cell at the jail. Mr. Williams admitted that he did not want to testify against Defendant at trial but he said that his trial testimony was truthful.

Mr. Williams was again called to testify concerning this issue at the motion for new trial hearing. He identified the letter referenced in his earlier testimony at the sentencing hearing that was sent to him from "Damian Reign" from an address in New

York.  Mr. Williams testified that he did not know Damian Reign, and he was not related to him.   On cross-examination, Mr. Williams read the contents of the letter to the jury.  The handwritten letter itself is not signed by anyone and contains in part:

> But check this out[.]  [M]y lawyer told me that the D.A. [is] still try[ing] give me 12 years with my six years running wild so you know that [is] 18 years.  [H]e told me that it [is] go[ing] [to] be the same to you [sic] come testify on my behalf that Rick Kelly [and] Kate Bynam made you write that statement lying [and] saying that I was with you."

The author of the letter further directed Mr. Williams to say that Defendant was walking up when he was arrested and that Mr. Williams and Defendant were never together, and the other person who committed the robbery "got away."  Mr. Williams was told to "plead the fifth" if asked the identity of the other person. The letter also stated that nothing could be done to Mr. Williams because he had already been sentenced and that he could not be charged with perjury.  Mr. Williams admitted that he thought the letter might have been written by Defendant.

The trial court made the following findings concerning this issue:

> Next, the defendant says that a new trial is warranted because of inculpatory statements made by his former co-defendant, Jimal Williams, while testifying at trial, some of which were possibly recanted in a letter, but then completely reaffirmed by the co-defendant's testimony at the sentencing hearing.  I realize that that's difficult to follow the chain, but that's essentially what happened.
>
> Having observed all of the testimony, the Court accredits the sworn testimony of Mr. Williams because it is in accord with other credible evidence.
>
> A post-trial statement inconsistent with his trial testimony, the truth of which statement was later denied in further sworn testimony, when considered in view of all the evidence is not sufficient to raise, in the Court's mind, a serious concern as to the reliability of the verdict in this case.

The trial court in this case properly denied Defendant's motion for new trial based on newly discovered evidence.  Defendant has not shown that the letters were material or that they would likely change the result of the trial.  The trial court specifically accredited Mr. Williams' trial testimony and essentially found that the two letters purporting to recant Mr. Williams' trial testimony were not credible.  Mr. Williams maintained at both the sentencing hearing and the motion for new trial hearing that his trial testimony was

true, and his trial testimony was consistent with other evidence introduced at trial. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the reasons stated herein, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, PRESIDING JUDGE